IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 19-CR-00020-RM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

TEVON THOMAS,

    Defendant.

---

## MOTION TO SUPPRESS
---

Tevon Thomas moves to suppress any and all evidence obtained as a result of his being detained in violation of his Fourth Amendment rights.

## FACTUAL BACKGROUND[1]

Mr. Thomas lives with his mother in the Foxdale Condominiums in Aurora, Colorado. On November 10, 2018, around 4:00 a.m., Mr. Thomas was sitting in the front passenger seat of a car parked in a parking spot at Foxdale Condominiums. It was parked in a small, 30-car lot surrounded by condos on all sides, with one point of entry and exit. Reanna Drinkwater, the car's owner, was sitting in the driver's seat. They were having a deep, serious conversation about their relationship. They had met about a month earlier and throughout the month had been talking about being boyfriend and girlfriend. However, on this night, Ms. Drinkwater was breaking it to Mr. Thomas that she was getting back together with her ex-boyfriend and that she just wanted to be friends. Mr. Thomas was not mad, just sad, and was telling her about his feelings.

---

[1] All facts are taken from discovery provided by the government.

About 30 minutes to one hour into this emotional conversation, two marked police SUVs arrived in the parking lot. One pulled up right behind Ms. Drinkwater's car, with its headlights and floodlight shone directly into the car. The SUV boxed them into that parking spot and blocked the only way in and out of the lot. Two armed, uniformed officers with the Aurora Police Department (APD) got out of the SUV, approached the car on both sides, and shined flashlights into it. Within seconds, a third armed APD officer joined them on the passenger side.

The officers were responding to a call from another resident of Foxdale Condominiums. Giorgi Martinez, a young, white female, called the APD after she came home from work around 3:30 a.m. because, as she explained to dispatch, "there was someone parked a few cars away from me, and their car was just on and it was stalling, and it just seemed kind of weird to me because I don't recognize that car, and I don't know. I was just creeping myself out a little bit about it." Ms. Martinez was apparently afraid that someone might kidnap her: "This is the same time I get home every day, so if someone really wanted to kidnap me, they'd know what time I get home." Ms. Martinez expressly recognized that this "was kind of ridiculous," and she made clear to the operator, "I wasn't necessarily calling to report the car, though, because, I don't know, they could have just been waiting for a friend, or something like that." She was calling the police on the advice of her parents: "I called my parents and they said I should ask if there's a cop that could escort me into the building. . . . I'm not necessarily sure that I need a police officer to walk me home. My parents just said I should try to call." When asked whether there were weapons involved and whether she was in danger, she answered, "no," and "I do not think so," respectively. However, she did note that there were "two holes in the back right door" of the car. "They look like bullet holes to me," she said, "which kind of freaked me out a little bit more." As for a description of the driver, she explained that it was too dark to see. "I don't even know if it's a man

or a woman, because I was going to get out of the car if it was a woman. But I couldn't tell." The operator informed Ms. Martinez that officers were on their way.

APD Officers Roch Gruszeczka and Jonathan Fullam responded to the call and met Ms. Martinez at the 7-Eleven near her home where she had made the call. She explained to them that when she got home from work, "there was someone parked across from me and their car was just on stalling for like an hour. I feel like they were waiting for me to get out of the car because I get home at the same time every night from work." When the officers asked her why she thought they were waiting for her, she was silent. Asked again, she said, "I mean, it's just not very bright, and I always feel a little creeped out getting home." The officers tried to determine whether there was a specific person who might try to harm her, "like is there an ex-boyfriend or anything?" "Oh, no, no, no. It just seemed kinda weird, and I just felt unsafe," she said with some laughter. The officers offered to escort her home. She was thankful, recognizing "[i]t's a little ridiculous, but I appreciate it."

At the parking lot, having escorted Ms. Martinez home safely, Officer Gruszeczka approaches the driver's side while Officers Fullam and Cassie Longnecker approach the passenger side. Officer Fullam points out three bullet holes on the passenger side of the car. Officer Longnecker comments that the bullet damage "looks old." Officer Fullam agrees.

Meanwhile, Ms. Drinkwater rolls the window down for Officer Gruszeczka who greets them and says, "I'm contacting you guys just because—have you guys been out here for awhile?" Ms. Drinkwater and Mr. Thomas both respond, indicating yes.

Officer Gruszeczka asks, "Do you guys live here?" Mr. Thomas replies, "Yeah, on the other side," gesturing to the other side of the building where he lives with his mom.

Officer Gruszeczka then tells Ms. Drinkwater to turn the car's engine off: "Can you turn the car off for me?" "Turn the car off?" she asks. "Yeah." She complies.

Officer Gruszeczka asks again, "Where do you guys live at?" Ms. Drinkwater says, "We were just talking. Why, what's the—"

"Well, you guys are parked here so people are calling, and they said you've been out here for a while," Officer Gruszeczka explains. Ms. Drinkwater doesn't see why that's a problem, but she offers to leave anyway. "I don't know. OK. We can move."

Officer Gruszeczka ignores her attempt to leave and asks again, "Where do you guys live at?" Ms. Drinkwater says, "I live down the street." Despite that Mr. Thomas has already told Officer Gruszeczka that he lives there, the officer asks him again, "Where do you live at, sir?" Mr. Thomas starts to explain, "My mother stays—," but Officer Gruszeczka interrupts him: "Honestly, where do you guys live at?" Ms. Drinkwater again says, this time more assertive and slightly annoyed, "I live down the street." Mr. Thomas again says, "My mother stays here." Officer Gruszeczka presses Mr. Thomas. "In these apartments?" "Yes," Mr. Thomas states clearly, now repeating himself for the third time.

Officer Gruszeczka continues his interrogation. "OK. Why are you guys hanging out here?" Mr. Thomas says, "We're talking," as Ms. Drinkwater had already explained.

"OK. Are you guys like boyfriend and girlfriend?" Officer Gruszeczka asks, touching on a sensitive situation. Mr. Thomas shrugs with his hands. Ms. Drinkwater says, "We're friends."

Officer Gruszeczka wants to know how long they've been there. "Thirty minutes," Ms. Drinkwater estimates. "Not like an hour, 2 hours or so?" he asks. Ms. Drinkwater mumbles, "mm mmm," indicating no.

"Is there anything in the car I should know about?" Officer Gruszeczka asks accusingly. Ms. Drinkwater says, "No." He repeats the question to Mr. Thomas: "Sir? Anything in the car I should know about?" Mr. Thomas shrugs and mumbles, "No." Officer Gruszeczka continues pressing the issue: "So if I look through the car, there's nothing that I would find?" Ms. Drinkwater seems somewhat taken aback: "No. Why would you need to look through my car?"

Officer Gruszeczka then claims that what they're saying "doesn't make sense," that they're "saying two different stories," and that "neither of [them] live [there]." For no apparent reason, Officer Gruszeczka completely dismisses Mr. Thomas's honest assertion that he does, in fact, live at those apartments, and that they were just sitting in the car to have a peaceful place to have a serious talk.

Ms. Drinkwater again attempts to leave in order to end the unnecessary confrontation: "OK. Well I can move if that's the problem. We're just sitting out here talking." But Officer Gruszeczka again ignores her request.

Officer Gruszeczka then asks whose car it is and requests both of their IDs. He also asks Mr. Thomas again, "Is there anything you'd like to tell me?" And he accuses Mr. Thomas of "being nervous." Mr. Thomas calmly says, "It's not me being nervous." Ms. Drinkwater and Mr. Thomas both explain that they're "just confused." Presumably they are confused as to why they are being hassled by the police for just talking in a parked car at Mr. Thomas's apartment complex, and confused as to why Officer Gruszeczka refuses to believe them.

Officer Gruszeczka eventually orders Ms. Drinkwater out of the car and interrogates her alone between her car and the SUV. She explains that the officers just interrupted a deep conversation in which she was essentially breaking up with Mr. Thomas. After he is through

questioning Ms. Drinkwater, Officer Gruszeczka has her sit in the backseat of his SUV for warmth, as she had been shivering and complaining about the freezing weather.

Officer Gruszeczka then joins his fellow officers on the passenger side of Ms. Drinkwater's car. He opens the door and orders Mr. Thomas out of the car. Officer Fullam spots the handle of a gun sticking out of Mr. Thomas's sweatpants pocket. The three officers draw their firearms, aim them at Mr. Thomas, and yell at him not to move. Mr. Thomas complies, the officers seize the firearm, and handcuff Mr. Thomas without incident.

Eventually, the officers discover that Mr. Thomas has a prior felony conviction, and they arrest him for possession of a weapon by a prohibited person.

Mr. Thomas now moves to suppress all evidence, in particular the firearm, seized as a result of his being detained without reasonable suspicion.

## ARGUMENT

"The Fourth Amendment . . . prohibits unreasonable seizures by law enforcement officers." *United States v. Hernandez*, 847 F.3d 1257, 1263-64 (10th Cir. 2017). The Supreme Court has recognized "three types of police-citizen encounters[:] (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009) (internal quotation marks omitted) (alteration in original). Here, law enforcement officers unconstitutionally detained Mr. Thomas when, without reasonable suspicion of criminal activity, two marked police cars boxed in the car he was in, shined headlights, a floodlight, and flashlights into the car, and three armed, uniformed police officers surrounded the car.

## I.     The officers seized Mr. Thomas.

A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "[T]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quotation marks omitted).

"Even if a reasonable person would not have felt free to leave, a seizure would occur only if the suspect yielded to a police officer's show of authority." *United States v. Gaines*, 918 F.3d 793, 796 (10th Cir. 2019) (citing *California v. Hodari D.*, 499 U.S. 621, 626-27 (1991)). "The Supreme Court has explained that 'what may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.'" *United States v. Salazar*, 609 F.3d 1059, 1065 (10th Cir. 2010) (quoting *Brendlin v. California,* 551 U.S. 249, 262 (2007)).

Here, then, the question is whether a reasonable person in Mr. Thomas' and Ms. Drinkwater's position would have felt free to drive away, or get out of the car and walk away, as a marked APD SUV pulled up behind them, boxed them into the parking spot, and blocked the only exit out of the lot; the SUV shined its headlights directly at their car; a more powerful floodlight lit up Ms. Drinkwater's car; a second marked police car pulled up behind the first; two armed, uniformed APD officers got out of the car; they shined flashlights into the vehicle as one officer approached the driver's side and the other approached the passenger side; and a third armed, uniformed APD officer approached the car as well. At this point, boxed in by police cars,

surrounded by three officers, with headlights, a floodlight, and flashlights all directed at their car, should Ms. Drinkwater and Mr. Thomas have felt free to "ignore the police presence" and drive or walk away? Absolutely not. Accordingly, the officers seized Mr. Thomas.

The Tenth Circuit has "enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police:

- the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers;
- whether the officers touch or physically restrain the defendant;
- whether the officers are uniformed or in plain clothes;
- whether their weapons are displayed;
- the number, demeanor and tone of voice of the officers;
- whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and
- whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent."

*Hernandez*, 847 F.3d at 1264. Here, these factors weigh in favor of finding that the officers seized Mr. Thomas as they surrounded Ms. Drinkwater's car.

First, although the location of the encounter was in the open, it was hardly a "public place where he [was] within the view of persons other than law enforcement officers," Mr. Thomas was parked in a private parking lot within the Foxdale Condominiums. It was, as Ms. Martinez emphasized, a poorly lit lot that was very dark at 4:00 am. And, at that hour, no one was around to view the encounter, other than the law enforcement officers.

Moreover, while the officers did not "touch" Mr. Thomas, he was nevertheless "restrained." That's because the first police SUV pulled up right behind the car he was in, physically preventing it from pulling out and driving away. And even if the officer did leave Ms. Drinkwater's car just enough space to squeeze out of the parking spot, there would still be nowhere to go. The two police cars were still blocking the car's only path out of the parking lot. Thus, Mr. Thomas was restrained in that the officers completely boxed him into the parking spot.

8

To be clear, it is not as if the officers simply had nowhere else to park and only inadvertently restrained the car; it was plainly a tactical decision. There were plenty of available spots to park in, or they could have driven past Ms. Drinkwater's car so as not to block her access out of the lot. The officers chose to box the car in, and that strategic maneuver would have been evident to any person in the blocked car. Accordingly, Mr. Thomas was restrained, and this factor weighs heavily in favor of finding that a seizure occurred.

The next three factors also weigh in favor of a seizure: the officers were in uniform; they were plainly armed; and the three APD officers outnumbered the car's two occupants.

The next factor is inapplicable, as the officers did not retain any tickets or IDs.

Finally, the officers did not specifically advise Mr. Thomas that the encounter was merely consensual, nor did any of the officers' actions suggest that Mr. Thomas was free to ignore them. On the contrary, all of the officers' actions—namely their strategic positioning of the cars, the use of floodlights and flashlights, and surrounding the car with three APD officers—communicated to the car's occupants that the officers were specifically targeting them, and they were not free to simply drive or walk away.

Because a reasonable person in Mr. Thomas' shoes would not have felt at liberty to ignore the police and go about his business, a seizure occurred so long as Mr. Thomas yielded to the officers' show of authority. Just as "one sitting in a chair may submit to authority by not getting up to run away," *Salazar*, 609 F.3d at 1065, so too did Mr. Thomas submit to the officers' authority by remaining in the car and not driving or walking away. Accordingly, the officers seized Mr. Thomas, and they must have had reasonable suspicion for doing so.

## II. The officers did not have reasonable suspicion.

Because the seizure of [Mr. Thomas] constituted an investigative detention, also known as a 'Terry stop,' it can only be justified if the officers had specific and articulable facts and rational inferences drawn from those facts giving rise to a reasonable suspicion that [Mr. Thomas] was involved in criminal activity." *Hernandez*, 847 F.3d at 1267-68. This standard does not "invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." *Terry*, 392 U.S. at 22. "Rather, the Fourth Amendment requires at least 'some minimal level of objective justification' for making a stop." *Hernandez*, 847 F.3d at 1268 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "Importantly, it is the government's burden to prove the reasonableness of the officer's suspicion."

Here, at the point the officers seized Mr. Thomas, their only knowledge of any facts in support of reasonable suspicion came from Ms. Martinez. A tip from a witness "may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability *and* sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." *United States v. Soto-Cervantes*, 138 F.3d 1319, 1322-23 (10th Cir. 1998). However, "verification of facts readily observable to anyone on the street, without more, is insufficient to support a reasonable suspicion that criminal conduct is occurring." For example, "that the tipster accurately described a particular group of men does *not* . . . mean that the tipster also was correct that the men were engaged in drug dealing."

The same is true here. That Ms. Martinez accurately described a car parked in her parking lot does not mean that she was also correct that they were going to kidnap her. Based on the underlying facts Ms. Martinez reported (as opposed to the unsupported conclusions she drew), officers knew that two individuals were parked in a condominiuim parking lot from approximately

3:30 a.m. to 4:30 a.m., and the car had two holes on one side that may or may not have been bullet holes. That's it. And that does not come close to establishing reasonable suspicion to believe that Ms. Drinkwater and Mr. Thomas were engaged in kidnapping or any other criminal activity.

Indeed, additional comments Ms. Martinez made actually undermined reasonable suspicion. When asked why she believed someone would be there to harm her, she was speechless. She could not name anyone, e.g., an ex-boyfriend, that might want to kidnap her, and the only rationale she provided was that "it's just not very bright, and I always feel a little creeped out getting home." She even recognized, twice, that her fear of the car's occupants was "kind of ridiculous." And she went out of her way to clarify that she was not specifically reporting the car as involved in any wrongdoing, only that she was a little creeped out and would like an escort to her door. Thus, rather than bolstering the officers' reasonable suspicion, Ms. Martinez gave the officers plenty of reason to believe that any suspicion of wrongdoing was unreasonable.

Under the totality of these circumstances, the government cannot meet its burden to demonstrate that the APD officers had reasonable suspicion that Mr. Thomas was engaging in criminal activity at the time they seized him.

## CONCLUSION

For these reasons, this Court should suppress all evidence obtained as a result of the officers' unconstitutional detention of Mr. Thomas.

                                            Respectfully submitted,

                                            VIRGINIA L. GRADY
                                            Federal Public Defender


                                            /s/ Matthew K. Belcher
                                            MATTHEW K. BELCHER
                                            Assistant Federal Public Defender
                                            633 17th Street, Suite 1000
                                            Denver, Colorado  80202
                                            Telephone:  (303) 294-7002
                                            FAX:  (303) 294-1192
                                            Email:  Matthew_Belcher@fd.org
                                            Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on May 17, 2019, I electronically filed the foregoing *Motion to Suppress* with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email address:

Celeste Brianne Rangel, Assistant U.S. Attorney
Email:  celeste.rangel@usdoj.gov

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participants in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Tevon Thomas
via mail

/s/ Cecilia Hernandez
Cecilia Hernandez, Legal Assistant
Office of the Federal Public Defender